ANNA R. FISHER, Appellant, v. EDWARD SKOGLUND and C. A. L. JENSON, Appellees.

**Intoxicating liquors:** NUISANCE: GOOD FAITH SALES AS DEFENSE. A sale of liquor by one not holding a permit to any person under any circumstances or for any purpose is unlawful; and his good faith or reasonable effort to avoid imposition does not constitute a defense to an action to enjoin the nuisance.

**Same:** INJUNCTION: DISCRETION: COSTS. The court may in its discretion refuse a permanent injunction restraining the illegal sale of liquor, where it satisfactorily appears that the nuisance has been in good faith abated by the defendant, which is in no sense a merely formal act for the temporary purpose of shelter while threatened injunction was impending; but this discretion is not unlimited and is rarely exercised in favor of a defendant clearly shown to have violated the law, except when accompanied by the taxation of all costs against defendant.

*Appeal from Ida District Court.*—HON. M. E. HUTCHINSON, Judge.

FRIDAY, MAY 17, 1912.

ACTION in equity to enjoin the maintenance of an alleged liquor nuisance. Upon hearing the evidence the trial court dismissed the bill, and plaintiff appeals.— *Modified* and *remanded.*

*John F. Joseph* for appellant.

*M. M. White* for appellees.

WEAVER, J.—The defendant Jensen is the owner of the building in which Skoglund, his codefendant and tenant, has conducted a drug store. The prayer for injunction is based upon alleged unlawful acts of Skoglund in keeping for sale and selling intoxicating liquors in violation of law. The separate answer of Skoglund admits the ownership of the property and the use of the building as a drug store as alleged in the petition, but denies any violation of the law. He further informs the court by way of alleged defense that, "for months prior to the commencement of this action, he has been actually declining business in the way of compounding prescriptions requiring intoxicating liquors, for the reason that he did not have them in his store or in said building." The defendant Jensen, answering in his own behalf, admits the ownership of the building and its occupancy by Skoglund for use as a drug store, but denies the transaction of any unlawful business therein, and particularly denies knowledge of any unlawful acts therein on the part of his tenant. These allegations and denials are supplemented by the following statement: "This answering defendant further alleges the fact to be that he has had no knowledge whatever of the sale of intoxicating liquors in said building save and except a sale in the early part of October, 1910, to one Gould, the leader of the choir in one of the prominent churches in this city, and this answering defendant alleges that, since the sale to Gould in the early part of October, he has seen to it that there had been no intoxicating liquor kept in said building by said Edward Skoglund in violation of law, and that there has been no sales of intoxicating liquor made by said Skoglund or anybody else in said building since that time."

Upon the trial, evidence was introduced in support of the petition to the effect that the drug store was generally reputed in that neighborhood to be a place where intoxicating liquors were being illegally sold. One witness testi-

fied that, within the year immediately preceding the trial, he had seen defendant's clerk in the store make a sale of alcohol to a customer. Another witness, one Gould, testified to making purchases of liquor there on different occasions; the last purchase being made early in October prior to the trial in the following February. On cross-examination the defendant also developed the important fact that Gould was a painter and paper hanger by trade and member and leader of a church choir. For the defense several witnesses vouched for the good reputation of the drug store and its proprietor. For himself, Skoglund testified, admitting that he held no permit to sell intoxicating liquors, and made explanation of his conduct of the business, in part, as follows:

I have kept no intoxicating liquors but alcohol in my store since October last. Well, it is absolutely necessary in mixing up liniments and making up the tinctures. It is for that purpose that I keep alcohol. No, I have not kept any other intoxicating liquors in the store since the Gould incident. Other intoxicating liquors are sometimes used by druggists in compounding. Since the early part of October I have refused a good many prescriptions that contained other kinds of intoxicating liquors because I did not have them in stock. Yes, sir; I have not used any other kind of intoxicating liquors but alcohol in compounding prescriptions since October 1st last. As to the Gould incident, he came in rather late one morning, and I mentioned the fact that he was getting to work pretty late, and he said 'Yes,' that he was not feeling well, and gave me a good talk about that. He went on and told me for several minutes about needing the brandy, and I told him we don't sell it, and he said, 'You have it in stock.' And I said 'Certainly.' Then he mentioned the fact that he bought four ounces in the spring. I told him I knew that. He says, 'I can't go to the saloon and get it because I don't frequent those places,' and, after considerable talk, we talked at least five minutes I should judge, and I told him I would trust his honor that if he really needed it I would give it to him. Yes; I knew that

he was affiliated with one of the churches here in town. It is the Methodist Church. Yes; I knew he was affiliated with that church last October and was leader of the choir and sang at funerals in this town. . . . Yes, sir; I kept alcohol since the Gould incident in my stock, and have alcohol in my stock at the present time. No; I have no wine in my stock at the present time, nor have I any port wine. We have had port wine in the store. It was early in the fall when I disposed of it. I know the fellow's name if I can think of it to whom I sold the last port wine I had. I will think of it in a minute; anyway he was getting it for his mother, and I know he was an honest, straightforward fellow. That was not after the Gould incident. I sold him one quart bottle of port wine. No; I never had any other wine, champagne, nor anything else of that sort in stock. Well, during last summer, before the Gould incident, I let another party, a lady, have a quart of wine. I sold it in the package just as it came. I never sold any beer or gin. I haven't used any gin in prescriptions since the Gould incident, and we were out of gin for at least eight months before, and we haven't replaced it. We only used it in prescriptions. Then we had whiskey in stock, but we haven't now. I didn't sell any whisky, only used it for compound medicine. We used up the last of it some time prior to this Gould incident, and I may add, when I think of it, that when Mr. Gould got this brandy that he got, that there was about five or six ounces left, which I threw away at the time. No; I never carried Vimalt or Brewed Malt, nor have I any malt in stock now. No; I never carried Duffy's Malt Whisky, not even in original packages. I still carry alcohol, but I do not sell it without having it mixed so that it can not be used as a beverage. I commenced doing that along in the fall, real early. No; I did not sell to whomsoever wanted it. Nor to parties who came in and called for alcohol. I might have made one or two sales, but they were parties I know were going to use it actually as a liniment. I haven't had any permit from the district court. I carry a government license and have that now. I bought the government license because when I started in here I wrote the revenue officer at Dubuque and asked him whether it was necessary to carry a government license and explained to him fully that I did not have any inten-

tion of selling intoxicating liquors and I wanted his opinion.

The defendant Jensen was also a witness for the defense and said:

I met Mr. Skoglund first when he bought Mr. Nichols out and rented my building for a drug store. I gave him no privilege to sell intoxicating liquors in violation of law. Mr. Tom Brennan came down and told me about the Gould incident. That is the first I knew of it. No; I had no knowledge of any liquor being kept and sold in the store in violation of law up to that time. No liquor has been sold since that date to my knowledge. When Mr. Brennan told me about Mr. Gould, I went to Mr. Skoglund and told him what Mr. Tom Brennan had told me, and told him it could not be tolerated, couldn't be done, I didn't want it. Mr. Skoglund said he hadn't sold much and he wouldn't sell any more.

Possibly in justice to the appellees we should add to these statements the testimony given by their counsel in his argument to this court that Mr. Skoglund "is one of Iowa's best citizens, and that to reverse the ruling of the trial court will mean an injustice and wrong to one of God's noblest and best men."

The court trusts that it is not lacking in due respect and reverence for the character and standing of men who command such a tribute as this, but we are nevertheless at some loss to imagine upon what consistent theory, conceding the literal truth of his own showing, and rejecting entirely the testimony for the prosecution, defendant can fit himself into the role of victim of heartless persecution even though it be true, as counsel assures us, that these proceedings have been inspired or supported "by a few old ladies of the W. C. T. U." According to his own statement, he not only violated the law, but violated it repeatedly. Had he been a permit holder and the sales complained of, while technically unlawful, had been made in

good faith and under the belief that he was complying with the law, no court would be inclined to deal with him harshly or to reject his plea that he has reformed his methods of business and is now conducting it with strict regard to the requirements of the statute.

But the defendant knew that he had no permit, and that any sale made by him to any person under any circumstances or for any purpose was unlawful. The question of good faith or of reasonable effort to avoid imposition is not and cannot be in such a case. Nor can we comprehend the process of reasoning that finds in the fact that a purchaser of liquor illegally sold is "the leader of a church choir and sings at funerals" lends an odor of sanctity to the act of the illegal seller. But perhaps such is not the idea which actuates the pleading and proving of circumstances of this nature. A certain historical character has been quoted as saying he "would go a mile out of his way any day to kick a sheep," and there is a similar (though perhaps, not inexplicable) impulse in the defense of a certain class of cases involving alleged violations of law to go even farther from the merits of the controversy in order to kick a church or to cast disparaging imputations upon the "old ladies" whose consciences impel them to the thankless duty of insisting upon general obedience to the laws of the land.

Counsel for appellees does not seriously contend that Skoglund was not guilty of violations of law, but rests his support of the decree below upon some of our decisions in which it is held that the granting of a permanent injunction in cases of this kind is, to a certain extent, discretionary with the trial court, and if it satisfactorily appears that the nuisance has been in good faith abated, and there is no reason to believe that such abatement is merely formal or for the temporary purpose of shelter while the threat of injunc-

tion is impending, the denial of the writ will not be inter-
ferred with upon appeal. But this discretion of the trial
court is not unlimited, and, where the existence of the
nuisance is conclusively shown, a writ for injunction is
justified, and while upon a sufficiently clear showing of
the abatement of an admitted or well-proved nuisance the
court may refuse to enjoin its further maintenance, such
order should rarely, if ever, be entered unless it be accom-
panied with taxation of costs against the defendant, and
this is especially true where the abatement has been made
under threat or pressure of the very prosecution which is
being thus terminated. See *Offil v. Westbrook*, 151 Iowa,
446.

It is manifest from the record, including defendant's
own testimony, that he was violating the law from time to
time up to October, 1910, when the last sale was made to
the "leader of the church choir." It was this transaction
which attracted special public notice and brought about
these proceedings for an injunction, and it is
from this incident that Mr. Skoglund himself dates
the reformation in his business methods on which he relies
as an abatement. A prosecution in such case is neither
meddlesome nor unjustified, and the cost of it should not
be cast upon the plaintiff or upon the county. The denial
of an injunction under such circumstances is not a thing
which the defendant may demand as his right, and, if
granted at all, it is a matter of grace. Under the rule
of the decision in *Long v. Joder*, 139 Iowa, 471, we might
well reverse the decree below, but the weight to be accorded
to the conclusion reached by the learned trial court leads
us to say that the decree will be permitted to stand sub-
ject to the following modification: The costs of the court
below, including an attorney's fee, will be taxed to the
defendant Skoglund, and the cause will be remanded to
the district court for the entry of such modification upon
the proper record. The costs of this court, including an

attorney's fee of $50, will also be taxed against said defendant.—*Modified* and *remanded.*